IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

**KIMBERLY CONNORS**                                                                            **PLAINTIFF**

V.                         Case No. 2:20-CV-02217-PKH

**MERIT ENERGY COMPANY, LLC**                                       **DEFENDANT**

<u>**RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff, Kimberly Connors ("Connors"), by and through her attorney, respectfully submits the following Response in Opposition ("Response") to the Motion for Summary Judgment.

## I.    INTRODUCTION

Connors was hired by XTO Energy as a Lease Operator on December 2, 2002. (*See* Connors' Affidavit, attached hereto as Exhibit "A" (Doc. 35-1) and incorporated herein by reference, at ¶ 2.) At that time, and throughout the duration of her career as a Lease Operator, Connors was the only woman holding a field position with XTO Energy in Arkansas. The reports from Connors' annual employee evaluations throughout her nearly 20 years as an XTO Lease Operator show she had been a dedicated, hard-working, and exemplary employee, who consistently met and exceeded expectations and earned regular raises in pay. (Connors' Deposition, Doc. 28-3 at Ex. 1, pp. 48-72.)

During November 2019, 28 of XTO's 29 lease operators, including Connors, applied to work for Merit Energy Company ("Merit") in connection with Merit's purchase of XTO's operations and assets in Ozark, Arkansas. (*See* Merit's Statement of Facts, Doc. 30, at ¶¶ 1, 14-15.) Each applicant participated in an in-office interview as part of the process. Merit's candidate spreadsheet reflects that Connors' in-office interview on November 21, 2019 went well. (*See* Merit's Document Production, excerpted, attached hereto as Exhibit "B" (Doc. 35-2) and

incorporated herein by reference, at MEC0052: "18 years XTO, 54 wells… has knowledge, was contract pumper, 2 compressors and Abbott Station… Good communicator, dependable. States may be able to make improve [sic] by installing plungers. Currently dropping quite a few soap sticks. Seems to know her well personalities…")

Another candidate, Mark Andrews, did not interview well and was identified as a candidate to whom an offer would not be given during the initial stages of the candidate-selection process. (*Id.* at MEC0204.) Additionally, five more of the original 28 candidates elected at some point during the selection process to retire rather than continue as lease-operator candidates with Merit. (*Id.* at MEC0068.) Merit's Tentative Offer spreadsheet of candidates reflected Merit's intention, once the interviews had all been completed, to offer a position to each of the remaining twenty-two lease operator candidates. ((*Id.* at MEC0045, 0049-53 (November 25, 2019).) As of December 2, 2019, Connors was included in the list of "Tentative Offers." (*Id.* at MEC0052.)

Some candidates who had not interviewed well at the initial stages were given an opportunity to explain themselves or provide Merit with more information for its consideration in their ride-along interviews. For example, Jeff Teague's interview notes initially were "fast pace, tears up vehicles, doesn't repair small items…" (*Id.* at MEC0040.) At that time, Merit's interview spreadsheet reflected it did not plan to make him an offer. Later, his interview notes included the following clarification: "Asked about rushing and driving response back was – his [sic] says roads rough top speed first 3 hours 10 mph… Randy [rode] his route with Giles roads are rough and slow going." (*Id.* at MEC0052.) The ride along interviews for most candidates lasted one to two hours. (Deposition of Clay Munger, Doc. 30-2 at 78:24-79:1; *see also* Connors Aff. at ¶ 30.)

Connors' ride-along informal interview with Clay Munger on December 4, 2019 lasted about twenty minutes, however. (Connors Aff. ¶ 26.) He did not ask her any questions about her work experience as a lease operator, about her knowledge of the wells on her route, about why

2

Giles France was completing work for some of her (and others') locations. (*Id.* at ¶¶ 27-28; *see also* Munger Dep. at 84:6-16.) He seemed to Connors to lack interest in her as a candidate. (Connors Aff. at ¶ 27.) He directed her to drop him off to end the ride-along interview after seeing just 4 of her 54 well locations, and he only agreed after that to see the compressor station on her route because she asked him to. (*Id.* at ¶¶ 27-28.)

By the end of that week, Connors was one of just two lease-operator candidates who had been eliminated from the "Tentative Offer" list. (*Id.* at MEC0073, 0215.) Connors' interview notes did not include anything new or different to indicate a reason she had been eliminated from the candidate pool. (*Compare* MEC0052 *with* MEC0215.) By contrast, the notes for the other candidate eliminated after the ride-along interview stage, Rob Smith, were updated to state "cm [Clay Munger] have doubts about picking up speed… thinks he is overloaded..." (*Compare* MEC0198 *with* MEC0216.)

Clearly, Munger was key in Merit's decision not to hire Connors. He did not familiarize himself with any of Merit's policies before he began the candidate selection process. (Munger Dep. at 73:19-23 (Q: Did you review Merit employment policies? …Did you review any company policies as part of the applicant selection process? A: I didn't look over it, no, before this.).) He'd had very little training or instruction on non-discriminatory hiring practices generally or on Merit's hiring practices specifically. He testified to that, stating:

> Q: What training, if any, have you had with respect to your hiring practices?
>
> A: Very little.
>
> Q: Okay. Have you had, that you can recall, specific training about sexual harassment and how to deal with that as an operations manager?
>
> A: We have yearly meetings at our Dallas office. And people will come through HR saying, "Don't do this" or "Don't do that," and everything.
>
> ***

> Q: Okay. Have you received training about non-discrimination in the workplace?
>
> A: Other than what HR may have told us in the yearly meetings, whatnot, I don't believe so… not that I can recall.
>
> Q: Do you recall any specifics about discrimination that you would have learned at those annual meetings?
>
> A: No.

(*Id.* at 27:21-28:17, 73:12-23.)

Although he identified certain skills and characteristics he felt were necessary for a successful lease operator, he did not gather reliable information about whether candidates had those skills and characteristics. He testified extensively on that topic, stating:

> Q: What are the evaluation criteria for a lease operator [position]?
>
> A: Basically, coming to work in a timely manner; taking care of their wells; trying to produce them to the best that they can produce – get the most volume out of them; the way they take care of their equipment, their trucks; their safety-mindedness around equipment; their involvement in day-to-day operations… Taking care of their pickups. Making sure that housekeeping is good around their locations… communicating well with the mechanics, with the foreman, with their co-workers on what's going on…

(*Id.* at 54:23-55:7, 63:11-12.)

> Q: Is a college degree important in your opinion to a lease operator position?
>
> A: No.
>
> \*\*\*
>
> Q: What other characteristics or personality traits make a good lease operator?
>
> A: A person that's self-motivated, takes care of their equipment, wants to do the best job that they can with their tasks and their job duties, their pumping wells.

(*Id.* at 80:22-24, 81:24-82:3.)

> Q; Did the applicants have to complete an application?
>
> A: Yes.
>
> Q: What did the application ask?

4

    A:    Name, address, prior experience, [references]… race and, I think, gender.

\*\*\*

    Q:    … Did you review any document besides the application as part of the applicant selection process?

    A:    No.

    Q:    You didn't review employee files from XTO?

    A:    No.

    Q:    Did you ask to review employee files from XTO?

    A:    No.

(*Id.* at 70:13-71:11, 73:12-18.)

    Q:    … Did you gather information about applicants' safety history with XTO as part of the applicant selection process?
    A:    No.

(*Id.* at 88:21-23.)

    Q:    Do you recall asking or being told information about folks who had bad driving records or who were not careful with their trucks?

    A:    I don't recall any of that.

    Q:    Okay. So if they had a history of driving recklessly or driving inattentively, you wouldn't have known that, you don't believe?

    A:    I don't believe so.

(*Id.* at 101:10-17.)

The end result of Munger's ill-informed participation in the candidate evaluation process was that Connors, the only woman among the 28 applicants, was not hired despite being better qualified than many of the 20 lease operators Merit ultimately hired instead. For example, Connors had 17 years of experience with XTO, which is more than several applicants Merit ultimately hired:

    Will Cunningham –    7 years with XTO (*Id.* at MEC0184.)

5

| | |
|---|---|
| Bryan Simpson – | 7 years (*Id.* at MEC0184.) |
| Levi Smith – | 8 years (*Id.* at MEC0185, MEC0068.) |
| Matt Buckner – | 8 years (*Id.* at MEC0184.) |
| Jeff Teague – | 9 years (*Id.* at MEC0184.) |
| Zach Reeves – | 12 years (*Id.* at MEC0185.) |
| Kevin Flurry – | 12 years (*Id.* at MEC0187.) |
| Brian Campbell – | 13 years (*Id.* at MEC0068, MEC0185.) |
| Jonathan Morrow – | 14 years (*Id.* at MEC0068.) |
| Josh Fultz – | 14 years (*Id.* at MEC0068.) |
| Dennis Coy – | 14 years (*Id.* at MEC0187.) |
| Andy Schluterman – | 15 years (*Id.* at MEC0068.) |

Connors also was more knowledgeable about her job as a lease operator and the skills required to complete the job (*see id.* at MEC0052) than several successful applicants:

| | |
|---|---|
| Kevin Flurry – | "LACKS KNOWLEDGE" (*Id.* at MEC0215.) |
| Jonathan Morrow – | "SLOW KNOWLEDGE" (*Id.* at MEC0214.) |
| Zach Reeves – | "LIMITED KNOWLEDGE." (*Id.* at MEC0217.) |
| Levi Smith – | "DIDN'T ALWAYS GIVE GOOD ANSWERS" (*Id.* at MEC0216.) |

Connors, whose route had 54 wells, 2 compressors, and Abbott Station (*id.* at MEC0215), had been assigned and entrusted with a lengthier route by far than many other successful applicants:

| | |
|---|---|
| Carl Bangs – | "47 wells, 3 compressors…" (*Id.* at MEC0212.) |
| Matt Buckner – | "40 wells, no compressors" (*Id.* at MEC0216.) |
| Chad Campbell – | "11 wells flowing now. 4 compressors. 34 wells and 8 compressors prior to the flood." (*Id.* at MEC0213.) |

6

| | |
|---|---|
| Dennis Coy – | "33 wells, 4 compressors." (*Id.* at MEC0214.) |
| Will Cunningham – | "35 wells, 9 compressors wellhead" (*Id.* at MEC0217.) |
| Keith Downs – | "30 producing wells, 9 compressors, 2 central point stations." (*Id.* at MEC0215.) |
| Kevin Farmer – | "34 wells 38 stops." (*Id.* at MEC0215.) |
| Kevin Flurry – | "Has 33 wells 11 compressors" (*Id.* at MEC0215.) |
| Joshua Fultz – | "27 wells 10 compressors, 3 central point compressors." (*Id.* at MEC0214.) |
| Jonathan Morrow – | "29 wells 37 stops with central points 3 compressors…" (*Id.* at MEC0214.) |
| Darrell O'Neal – | "26 wells, 10 active compressors." (*Id.* at MEC0213.) |
| Brian Patterson – | "30 wells 5 wellhead compressors no big stations." (*Id.* at MEC0212.) |
| Zach Reeves – | "23 wells 11 compressors" (*Id.* at MEC0217.) |
| Bryan Simpson – | "Pumps 6 total compressors… 34 wells and stops." (*Id.* at MEC0212.) |
| Levi Smith – | "33 wells" (*Id.* at MEC0216.) |
| Jeff Teague – | "42 wells, 6 compressors." (*Id.* at MEC0216.) |

Because there are many facts at issue in this case from which a jury could conclude that Merit's decision not to hire Connors was due to her age and gender, summary judgment in Merit's favor is inappropriate.

## II.   LAW & ARGUMENT

### A.   Summary Judgment Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

At the summary judgment stage, the court must view all facts in the light most favorable to the non-movant and must give the non-movant the benefit of all reasonable inferences in deciding whether summary judgment is appropriate. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). The court does not weigh the credibility of the evidence, but rather must focus on whether a genuine issue of material fact exists for trial. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

    B.  *McDonnell Douglas* **Burden-Shifting Framework.**

Gender-discrimination claims under Title VII and age-discrimination claims brought pursuant to the ADEA both can be analyzed using the *McDonnell Douglas* burden-shifting framework. *Id.* at 1046 (gender-discrimination); *Hilde v. City of Eveleth*, 777 F.3d 998, 1003 (8th Cir. 2014) *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 515 (8th Cir. 2011); *Cherepski v. Apple, Inc.*, 2014 U.S. Dist. LEXIS 97146, at *8 (E.D. Ark. July 17, 2014) (age-discrimination).

Under that framework, a plaintiff must first establish a prima facie case of discrimination. "A plaintiff establishes a prima facie case in a 'failure to hire' case" by showing: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position for which the employer was accepting applications; (3) [s]he was denied the position; and (4) the employer hired someone from outside the protected class." *Arraleh v. Cty. Of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006). "Once

8

the plaintiff establishes [her] prima facie case, the employer may rebut the prima facie case by articulating one or more legitimate, nondiscriminatory reasons for its decision." *Id.*

If the employer establishes a non-discriminatory basis for its decision, the burden shifts back to the plaintiff to establish that the reason articulated by the employer is pretext for an impermissible reason. *Hilde*, 777 F.3d at 1004. The plaintiff may do so by identifying evidence that a discriminatory motive is more likely the true motivation for the employer's decision. *Id.* (citing *Torgerson*, 643 F.3d at 1047); *see also Arraleh*, 461 F.3d at 975-976 (Once an employer identifies its nondiscriminatory reason, "the plaintiff is left with the opportunity to demonstrate that the proffered reason is not the true reason for the employment decision."). Or, the plaintiff may meet its burden by demonstrating that the employer's justification for its decision is simply not credible. *Id.*

Thus, "[f]or a plaintiff to survive summary judgment, she must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions." *Stalhut v. City of Lincoln*, 145 F. Supp. 2d 1115, 1126 (D. Neb. 2001) (citing *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 717 (8th Cir. 2000)). *See also Faulkner v. N. Little Rock Sch. Dist.*, 2020 U.S. Dist. LEXIS 146418, at *9 (E.D. Ark. Aug. 14, 2020) (citing *Torgerson*, 643 F.3d at 1047 ("A plaintiff may demonstrate that a material question of fact exists regarding pretext by showing 'that the employer's explanation is unworthy of credence because it has no basis in fact' or… that 'a prohibited reason more likely motivated the employer.'")).

C. **Genuine Issues of Material Fact Remain to be Tried.**

Here, Connors indisputably has established a prima facie case for both her gender-discrimination and her age-discrimination claims. For both claims, she belonged to a protected class because she is a woman who was over the age of 40 at the time Merit chose not to hire her.

9

She was qualified for the lease operator position for which Merit was hiring, as all the lease operator applicants were. She was passed over for one of the 20 lease operator positions; Merit instead hired 20 men, 11 of whom were younger than Connors, including 7 men under age 40. (*See* Merit Doc. Prod. at MEC0192.)

Remarkably, Merit's contemporaneous interview notes do not reflect *any* justification for Merit's last-minute decision not to hire Connors. (*Compare* Merit. Doc. Prod. at MEC0052 (Nov. 25, 2019) *with id.* at MEC0215 (Dec. 6, 2019).) It was once Merit received Connors' EEOC Charge of Discrimination that the search for justification began. Melanie Lane, Merit's Vice President of Human Resources, emailed Clay Munger and Randy Sanders, who was the other Merit interviewer, requesting as follows:

> Please let me know the reason that we didn't hire Kimberly. Hopefully you have some notes from her interview that you can share with me. Ideally, I'd also like an explanation as to what you used as criteria when selecting those individuals that received offers.

(*Id.* at MEC0140 (April 1, 2020).)

It was not until *after* this request that, for the first time, Merit asserted the candidates who it hired had "demonstrated a greater enthusiasm for the position, shared process improvement ideas during their interview, and wore their fire resistant clothing (FRC) properly." None of the interview notes included those criteria. (*See id.* at MEC0184-187, MEC0198, MEC0204, MEC0212-217.) The interview questionnaire that Munger and Sanders used also did not include those criteria. (*Id.* at MEC0043.) Now, Merit asserts even more new justifications for its decision not to hire Connors. (*See generally*, Merit's Statement of Facts.)

Merit's lack of initial justification, its unconvincing and inaccurate new reasons, and the additional rationalization seemingly fabricated during litigation clearly establish that there are genuine issues of material fact as to pretext. For example, Merit's assertion that Connors was not

chosen because she did not wear her fire-resistant clothing appropriately is unworthy of credence. Merit points out that Connors' in-office yearbook photo shows her FRC shirt unbuttoned. (Merit's Statement of Facts at ¶ 42.) However, Connors was not the only employee in the yearbook whose photo did not reflect FRC. (Connors Depo. At pp. 79- 100 (including photos of Giles France, Joshua Fultz, Matt Buckner, William Cunningham, Carl Bangs, Brian Campbell, Chad Campbell, Jonathan Morrow, and Andrew Schluterman, each of whom Merit hired, also not wearing FRC.) Furthermore, XTO did not require lease operators to wear FRC when they were in the office. Connors explained that she had unbuttoned the shirt while in the office because she had gained weight and it was uncomfortable. (*Id.* at 57:21-60:3.) Finally, Connors received pullover FRC tops as a safety award (*id.*; Connors Aff. at ¶¶ 17-18), which she wore exclusively for work from that point forward.

Second, Merit's spreadsheet specifically included Connors' ideas for process improvement discussed in her interview. It stated, in part, as follows:

> 18 years XTO, 54 wells… has knowledge, was contract pumper, 2 compressors and Abbott Station… Good communicator, dependable. **States may be able to make improve [sic] by installing plungers.** Currently dropping quite a few soap sticks. Seems to know her well personalities…

(*Id.* at MEC0052 (emphasis added).) Thus, Merit's justification on the basis that its chosen candidates shared process improvement ideas during their interview and Connors did not is simply untrue.

Similarly, Merit's assertion that Connors was one of the three candidates Merit elected not to hire in part because the successful candidates had greater enthusiasm also is untrue and unworthy of credence:

Darrell O'Neal –   "Said he is good either way getting a job or not." (*Id.* at MEC 0050.)

Kevin Farmer –   "Likely never gets out of his truck. Has 40 wells, one of them was down for two days before James (mechanic) came across it and fixed

11

|  |  |
|---|---|
|  | it for him… Sounded full of himself.  Would not recommend a position." (*Id.* at MEC 0051.) |
| Jeff Teague – | "Tr[ie]s to take care of just his business." (*Id.* at MEC0052.) |

None of these is a true reason Merit rejected Connors in favor of less-qualified applicants.

As is set forth above, Merit's implication that because all candidates were XTO employees at the time of their interviews, they all were equally qualified also is untrue.  Connors had 17 years of experience with XTO, which is more experience than twelve of the applicants Merit ultimately hired had.  (*See infra*, pp. 5-6 (5 successful candidates had less than 10 years' experience, 6 had 12 to 14 years, and 1 successful candidate had 15 years).)

Connors did a better job of caring for company equipment than several successful applicants.  (Connors' Aff. at ¶ 20; Merit Doc. Prod. at MEC0040 (Levi Smith kept a "NASTY TRUCK" and Jeff Teague "TEARS UP VEHICLES, DOESN'T REPAIR SMALL ITEMS.").) Caring for company equipment was an important evaluation criterion.  (*See* Merit Doc. Prod. at MEC0043; Munger Dep. at 54:23-55:7, 61:2-23, 62:6-19.)

Connors' interview notes also reflected she was more knowledgeable than several successful applicants and that her route was more extensive than most of the candidates Merit ultimately hired.   (*See infra*, pp. 6-7.)  In fact, among the 16 candidates identified as having significantly shorter routes than Connors' route of 54 wells, the average number of wells was 33.1, and the median was 33.

That Merit either did not use at all or at least is not currently relying on its interview rubric (Merit Doc. Prod. at MEC0043) also supports a finding that material facts for this case are disputed.  *See*, *e.g. Dixon v. Pulaski Cty. Special Sch. Dist.*, 578 F.3d 862, 871 (8th Cir. 2009) (an employer's violation of its own policies and procedures may be evidence of pretext).  *See also Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1024 (8th Cir. 1998) ("[T]he fact that [an

12

employer] may have deviated from its [employee absenteeism] policies, when coupled with the fact that the company mischaracterized [the plaintiff's attendance record] in a manner giving rise to negative connotations, lends support to an inference of improper motive.").

Furthermore, the fact that one of the newly asserted justifications for its decision is Connors' alleged lack of enthusiasm is yet an additional reason summary judgment is inappropriate here, where enthusiasm has no bearing on a lease operator's job performance. *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) ("A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."); *See Coble v. Hot Springs Sch. Dist. No. 6*, 682 F.2d 721, 728-29 (8th Cir. 1982) (tailoring job qualifications to include criteria unrelated to the job duties – there, an unexplained French certification requirement for a school counselor position – in order to favor of a pre-selected candidate outside a protected class is evidence of pretext).

Finally, Merit's decision to reject Connors in favor of 20 men, many of whom were less objectively qualified indicates pretext sufficient to avoid summary judgment. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1049 (8th Cir. 2011) (a finding of pretext may be supported by evidence the employer hired a less qualified applicant).

### D.     CONCLUSION

For all the foregoing reasons, Connors respectfully requests the Motion for Summary Judgment be denied.

        Respectfully submitted,

        */s/ Angela C. Artherton*

        Angela C. Artherton, Ark. Bar No. 2012156
        324 W. Ridge Avenue
        Harrison, AR 72601
        Phone: (870) 741-4490
        Fax:   (870) 505-6986
        Email: angela@northarklegal.com

        *Attorney for Plaintiff, Kimberly Connors*

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 8th day of April, 2022, a copy of the foregoing was served upon the following counsel of record via email and via the Court's electronic filing notification system:

Mr. Michael B. Heister
Ms. Laura O'Hara
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
mheister@qgtlaw.com
lohara@qgtlaw.com

        */s/ Angela C. Artherton*